**[redacted]2516 BROOKS,CHARLIE V Loan 0200: HELOC 2ND LIEN 5/15 [[redacted]...08/12/2026**

A payment of **$64,660.39** is required to pay off this loan on **08/11/26**.

| | |
|---|---|
| Principal Balance: | **64,587.78** |
| Interest Type: | **Daily** |
| Interest Rate: | **7.700** |
| Interest Due: | **40.88** |
| One Day's Interest: | **13.6254** |
| Due Date: | **09/05/2026** |
| Amount Past Due by Payoff Date: | **0.00** |
| Past Due Payment Count: | **0** |
| Late Charge Due: | **31.73** |



**Credit Union of Texas**
**900 W. Bethany Drive, Ste. 500, Allen, TX 75013**
**Loan Origination Company Identifier:** [redacted]
**Loan Originator's Identifier:** [redacted]

# TEXAS HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURES

THIS SECUIRTY DOCUMENT SECURED AN EXTENSION OF CREDIT THAT IS THE TYPE OF CREDIT DEFINED BY SUBSECTION (A)(6) OF SECTION 50, ARTICLE XVI OF THE TEXAS CONSTITUTION

Borrower: **CHARLIE BROOKS**
Borrower: **KATHRYN BROOKS**
Address: [redacted]
**MANSFIELD, TX 76063**

Loan No. [redacted]**2516**

Closing Date: **June 24, 2020**

In this Home Equity Line of Credit Agreement and Disclosures (the "Agreement") the terms "you," "your," and "Borrower" mean each person who executes this Agreement. The words "we," "our," "us," and "Credit Union□ mean Credit Union of Texas. By signing below, you acknowledge receipt of a copy of this Agreement and you agree to all of the terms and conditions set out in the Agreement, as well as the terms and conditions set out in the Early Disclosure Statement you received with your loan application, any security document or deed of trust (the "Security Document") which you execute in connection with the line of credit, any advance request voucher or other document provided to you in connection with advances under the line of credit, and any other document which you execute or receive in connection with your line of credit, all of which are incorporated into this Agreement.

**1. SPECIFIC DISCLOSURES.** The following specific disclosures apply to your Home Equity Line of Credit, in addition to the other disclosures set out in this Agreement:

| | |
|---|---|
| Credit Limit: | **$80,001.00** |
| Draw Period Length: | **5 YEARS** |
| Repayment Period Length: | **15 YEARS** |
| Final Payment Date: | **07/05/2040** |
| Initial Annual Percentage Rate: | **4.20** |
| Margin: | **0.95** |
| Initial Daily Periodic Rate: | **0.01150684931** |

**Fees: Fees in connection with this closing of your Home Equity Line of Credit are as follows:**

| | |
|---|---|
| Appraisal Fees: POC ___ | $0.00 |
| Recording Fees: | $0.00 |
| Title Insurance | $0.00 |
| Flood Hazard Search: | $0.00 |
| Escrow Related Fees: | $0.00 |
| Credit Report: | $0.00 |

2. **YOUR PROMISE TO PAY**. You promise to pay to us or to our order at the address set out above or at such other location as we may designate, so much of your Credit Limit set out above as we may advance to you, plus interest and other fees, charges, and expenses as more particularly set out in this Agreement. Your promise to pay includes amounts advanced directly to you, to the Credit Union, or to any third party on your behalf, and by way of advances evidenced by loan advance request vouchers, the deposit of advances to your accounts with us and by any other means which we may authorize from time to time. Subject to policies we may adopt from time to time, each of you acknowledges and agrees that advances may be made upon the request of any Borrower, may be paid to or for the benefit of any Borrower, and that each Borrower agrees to repay all advances made under this Agreement, whether any such advance is made to or for the benefit of one or all of you. At our option, we may require all Borrowers to join in any request for an advance. You agree that if we receive conflicting requests or instructions from you we are not required to act on any such request or instruction.

3. **LINE OF CREDIT ADVANCES.**

a. **Accessing the Account.** Following the expiration of any rescission period after you enter into this Agreement, you will have access to your Line of Credit Account ("Account"). You may obtain advances at any time up to the amount of your Credit Limit during the Draw Period, subject to the terms of this Agreement. The length of your Draw Period is set out in Paragraph 1 of this Agreement. The Draw Period begins on the closing date. When the Draw Period expires, we reserve the right to extend or renew the Draw Period. If we do not extend or renew the Draw Period, when it expires you will no longer be able to access your Account. The Repayment Period begins upon the expiration of the Draw Period.

b. **Requesting an Advance.** You may obtain an advance on your Account by (i) authorizing us in person or by telephone to transfer the amount you request to an account of yours which you maintain with us (we may limit the types of accounts available for transfers); (ii) authorizing us to pay third parties on your behalf or on behalf of another; or (iii) using any other means that we may authorize from time to time. In the event that we subsequently provide you with additional means by which you can access your Account, you agree that the terms and conditions set out in this Agreement will apply to any such additional means of accessing your Account.

c. **Limits on Advances.** We do not impose any limit on the number of advances you may make on your Account during any given period of time. The minimum advance you can receive throughout the term of this Agreement is $4,000.00. We require an initial advance at the time you establish your account. We do not impose a minimum outstanding balance and, subject to your Credit Limit, there are no limitations on the amount of credit that may be obtained during any time period.

You may not receive advances on your Account if the total principal amount outstanding at the time you request an advance exceeds an amount equal to eighty percent (80%) of the fair market value of your homestead as determined as of the date that this Agreement is executed.

The maximum principal amount that may be extended under your Account, when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by your homestead on the date your line of credit is established, may not exceed eighty

percent (80%) of the fair market value of your homestead on the date your line of credit is established.

You may not obtain advances on your Account if your line of credit has been terminated or suspended. You may not obtain advances if the advance requested would cause your account balance to exceed your Credit Limit, and you agree that you will not attempt to do so. In the event that you exceed your Credit Limit or obtain an advance subsequent to the Draw Period, you agree to pay amounts in excess of your Credit Limit or amounts obtained subsequent to the Draw Period immediately upon our demand. You acknowledge and agree that, if at any time you exceed your Credit Limit, any such excess (i) will not increase your line of credit, (ii) may not be construed so as to require us to allow you to exceed your Credit Limit in the future, and (iii) may be characterized by us as an additional unsecured extension of credit to you.

4. **<u>PAYMENTS ON YOUR ACCOUNT</u>.**

a. **In General.** You agree to make minimum periodic payments on your Account. The manner in which we determine the amount of your periodic payments and the frequency of your payments is set forth below. You agree to pay at least the minimum payment on or before the due date reflected on your billing statement. Your payment will be credited to your Account on the day we receive it. If, at any time, the balance of your Account is less than your required minimum payment, you agree to pay the entire balance.

b. **Prepayment Without Penalty.** You may prepay all or any part of the balance of your Account at any time without penalty. However, if you pay early, and your payment does not pay off the balance of your Account, you must continue to pay at least your minimum periodic payments until the balance of your Account is paid in full.

c. **Minimum Payment During the Draw Period.** During the Draw Period, payments will be due monthly, unless you and we otherwise agree. Your payments will equal the finance charges that accrued on the outstanding balance during the preceding month, together with all past due amounts, amounts in excess of your Credit Limit, late charges, insurance premiums and other fees imposed to the extent allowable by applicable law. During the Draw Period, minimum periodic payments will not fully repay the principal balance outstanding on your account.

**d. Minimum Payments During the Repayment Period.** During the Repayment Period, payments will be due monthly unless you and we otherwise agree. Payments will be calculated following the last day of the Draw Period and will be equal to an amount necessary to amortize the balance over the Repayment Period, together with all past due amounts, amounts in excess of your Credit Limit, late charges, insurance premiums and other fees imposed to the extent allowable by applicable law. An increase or decrease in the annual percentage rate will affect the amount of any payments you will make. During the Repayment Period, your payments will be substantially equal.

**e. How Payments Are Applied.** We may apply payments that you make in any order that we choose, subject to applicable law.

**5. FINANCE CHARGES.**

a. **Circumstances Under Which a Finance Charge Will Be Imposed.** You agree to pay a finance charge on all advances made on your Account. A finance charge will be imposed on the daily unpaid balance of your Account.

b. **When Finance Charges Begin to Accrue.** The finance charge on any advance begins to accrue immediately from the time we post the advance to your Account. There is no grace period during which finance charges will not accrue on your Account.

c. **How the Finance Charge Is Determined.** The finance charge on your Account is determined for each day during the billing cycle by applying the applicable daily periodic rate to the outstanding Account balance for that day. The daily Account balance is determined by taking the balance of your Account at the beginning of the day, adding any new advances, insurance premiums and, if applicable, other debits, and subtracting any payments, credits and unpaid finance charges. The total finance charge for the billing cycle is determined by adding the finance charge on your balance for each day during the billing cycle.

d. **Variable Rate.** The periodic rate and the corresponding annual percentage rate may vary and are based on the value of an index (the "Index") which is the Prime Rate as quoted in the Money Rates Section of the *Wall Street Journal* as determined fifteen (15) days prior to the effective date of any interest rate change. We may add a margin to the Index. To determine the annual percentage rate, we take the Index and round up to the nearest one-eighth of one percent (.125%) add the margin, if any. The annual percentage rate includes only interest and not other costs. The initial periodic rate and annual percentage rate, and the margin for your Account, are set forth in Paragraph 1 of this Agreement.

The initial periodic rate and corresponding annual percentage rate are "discounted" and are not based on the Index and margin used for later rate adjustments. The initial rate will be in effect for the period of time set forth in paragraph 1 of this Agreement. The current periodic rate and corresponding annual percentage rate that would have been applied using the Index and your margin in the absence of a discount rate are also disclosed in paragraph 1.

e. **Rate Changes.** The annual percentage rate is subject to change quarterly. Any change will be effective on the first day of January, April, July and October. An increase in the Index will result in an increase in the periodic rate which, in turn, may result in higher payments. A decrease in the Index may have the opposite effect. In any event, the daily periodic rate will never be less than a daily periodic rate with a corresponding **ANNUAL PERCENTAGE RATE** of 3.00%, and it will never be greater than a daily periodic rate with a corresponding **ANNUAL PERCENTAGE RATE** of 18%. Apart from this rate "floor" and the rate "cap", there is no limit on the amount by which the rate care change during any one year period.

f. **Tax Deductibility.** You should consult a tax adviser regarding the deductibility of interest and charges on your Account.

**6. SECURITY.**

The Account will be secured by a security interest in your home. You will execute the separate Security Document under the terms of which we will acquire a security interest in your home. The loss of your home may occur if an event of default occurs under this Agreement or

the Security Document. The only security for your Account is the property described in the Security Document (the "Property"). To the extent that any other agreement you may have with us, now or in the future, purports to grant a security interest in additional property to secure your Account, that agreement is superseded by this paragraph and any such security interest is expressly disclaimed and waived.

**7. INSURANCE AND MAINTAINING THE PROPERTY.**

You agree to maintain property insurance on the Property securing the Account and your obligations under this Agreement. You agree to insure the Property against fire and other hazards in amounts that we may require, and you agree to obtain flood insurance to the extent required by applicable law, and if the Property is located in a flood plain and in a community which participates in a federal flood insurance program. Your property insurance policy must name us as loss payee. You may obtain property insurance through any insurance company that is acceptable to us. You agree that, if you fail to maintain insurance as required under this paragraph, subject to applicable law we may purchase property insurance in order to protect our interest in the Property and add the premium to your balance or take any other action available to us under applicable law.

If we require, you agree to obtain a policy of title insurance naming us as an insured to the extent of the full amount of your credit limit. Any title insurance policy you obtain must be acceptable to us.

You agree to keep the Property in good repair and to maintain the Property regularly in such a manner and to such a degree to ensure that the Property does not decline in value or is otherwise endangered.

**8. PERIODIC STATEMENTS.**

You will receive a periodic statement from us reflecting any line of credit advances, late charges and other fees assessed, payments, and other credits on your Account during the billing cycle. Your periodic statement will inform you of your new balance and finance charges that have accrued during the billing cycle. Your statement will also reflect the minimum payment which you must make and its due date. You agree that we may mail statements to you at the address appearing in this Agreement.

**9. OTHER CHARGES AND COSTS.**

a. **Closing Costs.** You agree to pay all charges imposed, if any, in connection with your Account including any application fee we may impose, flood hazard determination fees, filing fees, document preparation fees, credit report fees, appraisal fees, courier fees, processing fees, and fees incurred in conducting a title search or obtaining a title insurance policy. Those fees, if any, are set forth in Paragraph 1 of this Agreement.

b. **Late Charges.** If your minimum payment is past due more than ten (10) calendar days from the date it is due, we may impose a late change equal to five percent (5%) of the payment due.

c. **Collection Costs.** In the event of default, you agree to pay all costs of collection which we may incur including attorney's fees and court costs in seeking to

enforce our rights under this Agreement and the Security Document, to the extent not prohibited by applicable law.

d. **Delinquent Property Taxes.** At our option, we may pay any delinquent property taxes owing on the Property securing amounts you owe under this Agreement, add amounts we pay to the principal balance owing under this Agreement, and assess a finance charge on the balance to the extent not prohibited by applicable law.

e. **Returned Check Charges.** If any payment item, including checks, electronic transfers, or bank drafts, are dishonored and returned to us unpaid, we may impose a returned check charge in the amount of $25.00.

**10. POSSIBLE ACTIONS THAT WE MAY TAKE IF YOU DEFAULT.**

Under certain conditions, we may take the following actions with respect to your Account:

a. **Terminating the Account.** We may terminate your Account and require you to pay us the entire outstanding balance in one payment if any of the following circumstances (events of default) occur:

i. You engage in fraud or material misrepresentation or omission in connection with your Account.

ii. You do not meet the repayment terms under this Agreement.

iii. Your action or inaction adversely affects the Property or our rights in the Property including, to the extent allowable by applicable law, your failure to insure the Property or pay taxes on the Property as they become due, the sale or other transfer of the Property.

iv. the creation of a senior lien encumbering the Property, or the foreclosure or threatened foreclosure of another lien on the Property.

b. **Refusal to Make Additional Extensions of Credit or Reducing Your Credit Limit.** We can refuse to make additional advances under your Account, or we may reduce your Credit Limit if any of the following events occur, subject to applicable law:

i. Any of the circumstances set forth in subparagraph (a) above occur.

ii. The value of the Property securing your Account declines significantly below the Property's appraised value for purposes of this Agreement.

iii. We reasonably believe you will not be able to meet your repayment obligations under your Account due to a material change in your financial circumstances.

iv. You are in default of a material obligation in this Agreement or the Security Document. All of your obligations under this Agreement and the Security Document are material for purposes of this provision.

v. Government action prevents us from imposing the annual percentage rate provided for, or impairs the priority of our security interest such that the value of the interest is less than 120% of the credit limit.

vi. A regulatory agency has notified us that continued advances would constitute an unsafe and unsound practice.

vii. The maximum annual percentage rate is reached.

c. **Our Remedies.** If an event of default occurs, we will notify you in keeping with applicable law. If you do not cure your default following any such notice, and we terminate your Account and require you to pay us the entire outstanding balance in one payment, we will proceed to enforce our security interest in the Property per the Security Document which secures this Agreement. Regardless of any interpretation or construction that may be accorded any provision of this Agreement or the Security Document, unless any owner of the Property or the spouse of any owner obtained this Account by actual fraud, our sole recourse in the event of default shall be to foreclose our security interest in the Property.

If we elect not to take any of the actions described in subparagraphs (a), (b), or (c) above, you agree that we will still have the right to do so if any of the events described in those subparagraphs occur at a later time. We may decline to enforce or we may delay enforcing any of our rights under this Agreement without forfeiting or otherwise affecting our ability to enforce any such rights at a later time.

## 11. POSSIBLE ACTIONS THAT YOU MAY TAKE.

You may terminate your Account at any time by notifying us in writing. If any of you terminate your Account, the Account will be terminated for all. You agree that, at our option, we may release any one or more of you from your obligations under this Agreement without releasing any other person from his or her obligations. If you terminate your Account, you will still be obligated to pay the remaining balance of your Account at the time of termination, together with any additional funds advanced to any of you after the Account is terminated, in keeping with the terms of this Agreement. Termination of the Account will not entitle you to any refund or credit for fees or other amounts previously paid, subject to applicable law. In the event that you terminate the Account, you agree that you will not request any additional advances under the Account and that you will not use any other means to access the Account from that point forward. You agree to ensure that no other person authorized to request advances under this Agreement will use the Account following termination, and you acknowledge and agree that you will remain liable for amounts advanced to any such person notwithstanding your termination of the Account.

## 12. CERTAIN CHANGES IN THE TERMS OF THIS AGREEMENT THAT MAY OCCUR.

Under certain circumstances, the terms of this Agreement may change, subject to applicable law. You agree that, if the Index or any subsequent Index is no longer available, we may select a new Index and Margin which will produce an annual percentage rate substantially similar to the annual percentage rate in effect at the time that the prior Index became unavailable. We may make changes to this Agreement to which you agree in writing. To the extent allowable by applicable law, you agree that we may make changes to insignificant terms of this Agreement, and we may make changes that will unequivocally benefit you for the

remainder of the term of your Account. To the extent allowable by applicable law, we may also make changes to the Agreement if we are ordered to do so by governmental agencies with regulatory authority over us.

13. **COMPLIANCE WITH APPLICABLE LAW.**

It is the intent of you and us to contract in strict compliance with applicable usury law. You and we agree that none of the terms and provisions contained in this Agreement, or in any other document executed in connection with this Agreement including the Security Document, shall ever be construed so as to create a contract to pay interest at a rate in excess of the maximum interest rate permitted to be charged by applicable law. You will never be required to pay interest under this Agreement at a rate in excess of the maximum interest that may be lawfully charged under applicable law, and the provisions of this paragraph shall control over all other conflicting provisions of this Agreement and any other documents executed in connection with this Agreement, including the Security Document. If the maturity of this Agreement is accelerated and you are required to pay us the entire outstanding balance in one payment, or if the principal balance owing under this Agreement is paid prior to the end of the term of this Agreement, and as a result, the interest received for the actual period of existence of your Account evidenced by this Agreement exceeds the applicable maximum lawful rate, we will refund to you the amount of such excess or, to the extent allowed by applicable law, we will credit the amount of such excess against the principal balance owing under this Agreement at that time. In the event that we collect monies which are deemed to constitute interest which would increase the effective interest rate under this Agreement to a rate in excess of that permitted to be charged by applicable law, all such sums deemed to constitute interest in excess of the legal rate shall, upon such determination, be immediately returned to you or, subject to applicable law, shall be credited against the principal balance owing under this Agreement at that time.

Further, it is the intent of you and us to contract in strict compliance with Section 50(a)(6)and Section 50(t), Article XVI of the Texas Constitution governing Equity Loans. You and we agree that none of the terms and provisions contained in this Agreement, the Security Document, or in any other document executed in connection with this Agreement, shall ever be construed so as to create a contract to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, 2% of the original principal amount of the extension of credit. In the event that we, or any person, shall collect monies which are deemed or held to be fees exceeding such 2% limitation, an amount equal to such excess shall, upon such determination, be paid to you. Upon such payment, you and we agree that we shall have complied with all of our obligations under this Agreement with regard to the 3% fee limitation referred to above.

The above notwithstanding, nothing in this Agreement shall be construed so as to diminish any right we may have to cure any violation of applicable law in keeping with the terms of Section 50(a)(6)(Q)(x) of the Texas Constitution.

14. **GIVING OF NOTICES.**

Unless applicable law requires a different method, you agree that any notice that must be given to you under this Agreement may be given by delivering it, or by mailing it by first class mail to you at the address set forth on page 1 of this Agreement, or at a different address if you give us written notice of your different address. You agree that, unless otherwise required by applicable law, any notice provided to one of you will be considered notice provided to all.

You agree that any notice that must be given to us under this Agreement will be given by mailing it by first class mail to us at the address set forth above, or at a different address if we give you notice of that different address.

**15. CREDIT AND RELATED INFORMATION.**

If we request that you do so, you agree to provide us with financial information and information concerning your credit including, but not limited to, a financial statement or updates to your loan application. You agree to furnish any information concerning the Property that we request from time to time. You agree to furnish the foregoing information within a time period and under the terms and conditions we may impose. You agree that we may, from time to time, make inquiries concerning your credit and you authorize us to obtain credit reports for that purpose. You authorize us to provide information concerning your Account with us to third parties including credit bureaus, merchants, and other financial institutions, to the extent permitted by applicable law.

**16. WAIVERS.**

You waive presentment and notice of dishonor. "Presentment" means the right to require us to demand payment of amounts due. "Notice of dishonor" means the right to require us to give notice that amounts due have not been paid. Your waiver of these rights is subject to applicable law.

**17. NO PERSONAL LIABILITY.**

Notwithstanding anything herein to the contrary, the loan advances represented by this Agreement and the Security Document are without recourse for personal liability against you or your spouse unless you or your spouse obtain the extension of credit represented by this Agreement and the Security Document by actual fraud. The provisions of this paragraph shall control over any conflicting provisions in this Agreement and the Security Document.

**18. JOINT AND SEVERAL LIABILITIES.**

If more than one person signs this Agreement, each person is obligated to keep all the promises made in this Agreement and each person is individually and jointly liable.

**19. RESCISSION.**

You and your spouse may, within three (3) days after closing, rescind this Agreement without penalty or charge.

**20. CONSTRUCTION OF TERMS AND CONDITIONS.**

The parties agree that this Agreement, the Security Document and any other document executed or provided in connection with your Account shall be construed so as to comply with Section 50, Article XVI of the Texas Constitution as well as any interpretations or commentaries issued by any agency authorized under Section 50(u), Article XVI of the Texas Constitution and Subchapter E, Chapter 15, Section 15.413 of the Finance Code of the State of Texas.

**21. ASSIGNMENT.**

You agree that we may assign or transfer this Agreement, the Security Document, and our rights and liabilities under each document, to any entity without notice to you unless otherwise required by applicable law. You acknowledge and agree that this Agreement and the Security Document shall be binding upon you, your heirs and legal representatives. However, you also acknowledge and agree that you may not assign this Agreement, nor the Security Document, nor any of your rights or liabilities under those documents without our prior written authorization.

**22. SEVERABILITY.**

If any provision in this Agreement or the Security Document is construed judicially so as to conflict with applicable state or federal law, you and we agree that any such provision will be considered modified to the extent that such modification is allowed by applicable law, so as to comply with existing law. In the event that any such provision cannot be so modified, under no circumstances will the conflicting provision be construed so as to conflict with any other provision of this Agreement, and this Agreement shall remain effective for all purposes notwithstanding any such conflict.

**23. GOVERNING LAW.**

This Agreement and the Security Document shall be construed under and shall be governed by the laws of the State of Texas to the extent not otherwise preempted by federal law.

**24. YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE.**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

*Notify Us in Case of Errors or Questions About Your Statement*

If you think your statement is wrong, or if you need more information about a transaction on your statement, write us at the address listed on your statement. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Described the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

*Your Rights and Our Responsibilities After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the statement was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your statement that are not in question.

If we find that we made a mistake on your statement, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your statement. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50.00 of the questioned amount, even if your bill was correct.

**25. NOTICE.**

**THIS PROVISION APPLIES IF YOUR CREDIT LIMIT EXCEEDS $50,000.00. THIS AGREEMENT CONSTITUTES A WRITTEN AGREEMENT PURSUANT TO §26.02 OF THE TEXAS BUSINESS AND COMMERCE CODE. THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**26. EQUITY LOAN UNDER THE TEXAS CONSTITUTION.**

**YOU AND WE AGREE THAT THIS AGREEMENT AND THE SECURITY DOCUMENT REPRESENT AN EQUITY LOAN SUBJECT TO SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION.**

BY SIGNING BELOW, YOU ACCEPT AND AGREE TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND THE SECURITY DOCUMENT. YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT AND THE SECURITY DOCUMENT AND THAT YOU HAVE RECEIVED A COPY OF ALL DOCUMENTS THAT YOU HAVE SIGNED WITH ALL BLANKS FILLED IN. YOU ALSO ACKNOWLEDGE THAT YOU RECEIVED A COPY OF THE EARLY DISCLOSURE STATEMENT AND THE FEDERAL RESERVE BOARD *HOME EQUITY LINES OF CREDIT* HANDBOOK AT THE TIME THAT AN APPLICATION WAS PROVIDED TO YOU.

[signature] 6/24/2025
**CHARLIE BROOKS/Date**

KBrooks 6/24/2020
**KATHRYN BROOKS/Date**

[redacted] PGS 11 Fee: $59.00 Submitter: SIMPLIFILE
Electronically Recorded by Tarrant County Clerk in Official Public Records Mary Louise Nicholson
Mary Louise Nicholson

After Recording Return To:

CREDIT UNION OF TEXAS
900 W Bethany Dr, Ste 500, Allen TX 75013
Loan Origination Company Identifier: [redacted]
Loan Originator's Identifier: [redacted]

**THIS SECURITY DOCUMENT SECURES AN EXTENSION OF CREDIT THAT IS THE TYPE OF CREDIT DEFINED BY SUBSECTION (a)(6) OF SECTION 50, ARTICLE XVI OF THE TEXAS CONSTITUTION**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER**

# TEXAS HOME EQUITY SECURITY DOCUMENT AND DEED OF TRUST
## (HOME EQUITY LINE OF CREDIT)

## DEFINITIONS

**(A) "Security Document"** means this Texas Home Equity Security Document and Deed of Trust, which is dated **June 24, 2020**, together with all Riders to this document.

**(B) "Borrower"** is **CHARLIE BROOKS AND WIFE, KATHRYN BROOKS.**

**(C) "Co-signer"** is any person who signs this Security Document but does not sign the Credit Agreement.

**(D) "Lender"** is **Credit Union of Texas.** Lender is a Credit Union organized under the laws of the State of Texas or of the United States of America whose address is **900 W. Bethany Dr, Ste 500, Dallas TX 75013**

**(E) "Trustee"** is **V. Eric Pointer.** Trustee's address is **900 W. Bethany Dr, Ste 500, Allen, TX 75013.**

**(F) "Credit Agreement"** means the Texas Home Equity Line of Credit Agreement and Disclosures dated **June 24, 2020**, and all extensions and renewals of that Credit Agreement, under the terms of which Lender has agreed to extend credit to Borrower from time to time, and under which Borrower may request advances, repay money, and re-borrow money from time to time. The outstanding principal balance owing under the Credit Agreement at any time may not exceed **$ 80,001.00** (the "Credit Limit"). The indebtedness owing under the Credit Agreement (the "Indebtedness"), if not paid sooner, and unless otherwise provided in the Credit Agreement, is due and payable on **07/05/2040** (the "Final Payment Date").

**(G) "Property"** means the property that is described below under the heading "Conveyance to Trustee".

**(H) "Riders"** means all riders to this Security Document that are executed by Borrower.

**(I) "Extension of Credit"** means the Home Equity Line of Credit account evidenced by the Credit Agreement which is comprised of the Indebtedness owing by Borrower to Lender including principal, interest, and all other amounts owing under the Credit Agreement and this Security Document. The Extension of Credit is a home equity line of credit as defined in Section 50(a)(6) and Section 50(t), Article XVI of the Texas Constitution.

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Escrow Items"** mean those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for (i) damage to, or destruction of, the Property, (ii) condemnation or other taking of all or any part of the Property, (iii) conveyance in lieu of condemnation or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Periodic Payment"** means the scheduled minimum payments due under the Credit Agreement including principal, if applicable, and accrued interest, together with all past due amounts, any amounts in excess of Borrower's Credit Limit, late charges, insurance premiums, and other fees imposed, and any amount payable under Section 3 of this Security Document.

**Conveyance to Trustee**

This Security Document secures to Lender: (a) the repayment of the Indebtedness and all renewals, extensions and modifications of the Credit Agreement, (b) the payment of all additional amounts advanced, and expenses incurred by Lender in connection with insuring and preserving the Property and its value, and discharging liens against the Property; and (c) the performance of Borrower's covenants and agreements under this Security Document and the Credit Agreement. For these purposes, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property (the "Property") located in **TARRANT** County, Texas:

**SEE EXHIBIT A**

which has the address of [redacted]**. MANSFIELD, TX 76063**, ("Property Address");

TOGETHER WITH all improvements now or hereafter erected on the Property, and all easements, appurtenances, and fixtures now or hereafter a part of the Property. All replacements and additions shall also be covered by this Security Document. Borrower acknowledges and agrees that, even though the amount of the Indebtedness owing on the Credit Agreement may be zero from time to time, this Security Document will continue in effect until all amounts advanced under the Credit Agreement throughout the Draw Period described in the Credit Agreement, and all other amounts owing under the Credit Agreement, are paid in full.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants that Borrower will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record. Borrower warrants that the Indebtedness is the only debt secured by the Property which meets the definition of an Extension of Credit under Section 50(a)(6), Article XVI of the Texas Constitution.

Borrower and Lender agree that the only security for the Credit Agreement is the Property described above. To the extent that any other agreement Borrower has with Lender, now or in the future, purports to grant a security interest in additional property to secure the Credit Agreement and repayment of the Indebtedness, that agreement is superseded by this paragraph and any such security interest is expressly disclaimed and waived.

Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the Indebtedness and any late charges and other amounts due under the Credit Agreement. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Credit Agreement and this Security Document shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Credit Agreement or this Security Document is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Credit Agreement and this Security Document be made in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Credit Agreement or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment(s) or partial payment(s) if the payment(s) or partial payment(s) are insufficient to bring the Indebtedness current. Lender may accept any payment(s) or partial payment(s) insufficient to bring the Indebtedness current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment(s) or partial payment(s) in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment(s) to bring the Indebtedness current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Credit Agreement immediately prior to foreclosure to the extent allowable by Applicable Law. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Credit Agreement and this Security Document or performing the covenants and agreements secured by this Security Document.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order or priority: (1) interest due under the Credit Agreement; (2) other fees and charges, if any, due under the Credit Agreement or the Security Document; (3) principal due under the Credit Agreement. Such payments shall be applied to each Periodic Payment in the order in which they became due. Any remaining amounts shall be applied to reduce the principal amount of the Credit Agreement.

Voluntary prepayments shall be applied to Principal without penalty.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Credit Agreement shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** If Lender requires, Borrower shall pay to Lender on the day Periodic Payments are due under the Credit Agreement, until the Indebtedness is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Document as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Indebtedness, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.

Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Document as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (1) sufficient to permit Lender to apply the Funds at the time specified under the federal Real Estate Settlement Procedures Act of 1974, as amended from time to time, 12 U.S.C. §2601, et seq. ("RESPA") and (2) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Document, Lender shall promptly refund to Borrower any Funds held by Lender. If, under Section 21, Lender exercises remedies under Rules 735 and 736 of the Texas Rules of Civil Procedure or such other rules as may be promulgated by the Supreme Court of the State of Texas, Lender shall apply any Funds held by the Lender as a credit against the sums secured by this Security Document.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Document, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Document unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Document. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Document, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower, at closing, to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Indebtedness.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Document. These amounts shall bear interest at the rate specified under the Credit Agreement from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Document, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In such event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (1) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Credit Agreement or this Security Document, and (2) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Credit Agreement or this Security Document, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the payments referred to in Sections 1 and 2 or change the amount of the payments. If under Section 21, Lender exercises remedies under Rules 735 and 736 of the Texas Rules of Civil Procedure, or such other rules as may be promulgated by the Supreme Court of the State of Texas, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the exercise of such remedies shall pass to the Lender to the extent of the sums secured by this Security Document immediately prior to the exercise of such remedies.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after execution of this Security Document, and for so long as Borrower owns the Property, shall continue to occupy the Property as Borrower's principal residence, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the application or the Extension of Credit. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Document.** If (1) Borrower fails to perform the covenants and agreements contained in this Security Document (2) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Document (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Document or to enforce laws or regulations), or (3) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Document, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to, (1) paying any sums secured by a lien which has priority over this Security Document, (2) appearing in court, and (3) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Document, including its secured position in a bankruptcy proceeding. "Securing the Property" includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Document, unless prohibited by law, or unless the same would diminish, impair, or adversely affect the lien conveyed to Lender herein. These amounts shall bear interest at the rate specified in the Credit Agreement from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Document, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Document, whether or not then due, with the excess, if any, paid to Borrower, subject to Applicable Law.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Document immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Document shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Document whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Document, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Document. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Document. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Document granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Document by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Subject to Section 31 below, Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, Co-signer (a) is co-signing this Security Document only to mortgage, grant and convey the Co-signer's interest in the Property under the terms of this Security Document; (b) is not personally obligated to pay the sums secured by this Security Document.

The covenants and agreements of this Security Document shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Document, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Document to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Document or by Applicable Law.

If the Indebtedness is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected or to be collected in connection with the Indebtedness exceed the permitted limits, then: (a) any such charges shall be reduced by the amount necessary to reduce the charges to the permitted limit; and (b) any sums already

collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Credit Agreement or by making a direct payment to Borrower, subject to Applicable Law. If a refund reduces principal, the reduction will be treated as a partial prepayment. Borrower's acceptance of any such refund will constitute a waiver of any right of action Borrower may have arising out of such overcharge, to the extent that such waiver is not otherwise prohibited by Applicable Law.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Document must be in writing. Any notice to Borrower in connection with this Security Document shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender, or unless otherwise provided in the Credit Agreement. If Borrower has provided a different address in the Credit Agreement from the Property address, notice may be given to Borrower at either address. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. Under no circumstances shall this provision be construed so as to require Lender to send or deliver notice to a Borrower at more than one address. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Document shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Document is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Document.

**16. Governing Law; Severability; Rules of Construction.** This Security Document shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Document are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Document or the Credit Agreement conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Document or the Credit Agreement which can be given effect without the conflicting provision.

As used in this Security Document: (1) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender, (2) words in the singular shall mean and include the plural and vice versa, and (3) the word "may" give sole discretion without any obligation to take any action.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Document. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Document. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Document without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Document discontinued at any time prior to the earliest of: (i) five days before the sale of the Property pursuant to any power of sale contained in this Security Document; (ii) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (iii) entry of a judgment enforcing this Security Document. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Document and the Credit Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Document, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Document to the extent allowable by Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Document, and Borrower's obligation to pay the sums secured by this Security Document, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Document and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Credit Agreement; Change of Loan Servicer.** The Credit Agreement or a partial interest in the Credit Agreement (together with this Security Document) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Credit Agreement and this Security Document and performs other mortgage loan servicing obligations under the Credit Agreement, this Security Document, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Credit Agreement. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing to the extent RESPA applies to the Extension of Credit. If the Credit Agreement is sold and thereafter the Indebtedness is serviced by a Loan Servicer other than the purchaser of the Credit Agreement, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer(s) and are not assumed by the Credit Agreement purchaser unless otherwise provided by the Credit Agreement purchaser.

**20. Hazardous Substances.** As used in this Section 20: (1) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (2) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (3) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (4) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (1) that is in violation of any Environmental Law, (2) which creates an Environmental Condition or (3) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (1) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (2) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (3) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender's part for an Environmental Cleanup.

**21. Default; Acceleration; Remedies.** Borrower shall be in default if (a) Borrower engages in fraud or material misrepresentation or omission in connection with the Extension of Credit, (b) the Borrower does not meet the repayment terms under the Credit Agreement, (c) Borrower's action or inaction adversely affects the Property or Lender's rights in the Property including, to the extent allowable by Applicable Law, Borrower's failure to insure the Property or pay taxes on the Property as they become due, the sale or other transfer of the Property, the creation of a senior lien encumbering the Property, or the foreclosure or threatened foreclosure of another lien on the Property, or (d) to the extent permitted by Applicable Law, Borrower breaches any covenant, obligation, or agreement in the Credit Agreement or this Security Document (all of the foregoing shall be referred to as "Events of Default" in this Security Document).

Lender shall give notice to Borrower prior to acceleration following an Event of Default (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Document and enforcement of the Credit Agreement and Security Document under Rules 735 and 736 of the Texas Rules of Civil Procedure, or such other rules as may be promulgated by the Supreme Court of the State of Texas. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Document without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 21, the term "Lender" includes any holder of the Credit Agreement who is entitled to receive payments under the Credit Agreement.

If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on a date and at a location permitted by Applicable Law.. Borrower authorizes Trustee to sell to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the property at any sale.

Trustee shall deliver to the purchaser a Trustee's deed conveying indefeasible title to the Property without covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Document, and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 21, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

The lien evidenced by this Security Instrument may be foreclose upon only by a court order. "Lender may, at its option, follow any rules of civil procedure promulgated by the Texas Supreme Court for expedited foreclosure proceedings related to the foreclosure of liens under Section 20(a)(6), Article XVI of the Texas Constitution ("Rules"), as amended from time to time, which are hereby incorporated by this reference. The power of sale granted in this Security Instrument shall be exercised pursuant to such Rules, and Borrower understands that such power of sale is not a confession of judgment or a power of attorney to confess judgment or to appear for Borrower in a judicial proceeding."

**22. Release.** Upon payment of all sums secured by this Security Document, Lender will sign and give Borrower a release of lien or an assignment of the Security Document, whichever is appropriate.

**23. Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Document may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**24. Subrogation.** Any of the proceeds of the Credit Agreement used to discharge all or any part of any outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment provided, however, that nothing contained in this Section shall be construed so as to impose personal liability upon any Borrower.

**25. Partial Invalidity.** In the event, any portion of the sums intended to be secured by this Security Document cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby, subject to Applicable Law.

**26. Location of Closing.** Borrower acknowledges that closing of the Credit Agreement and Security Document took place at the office of Lender, a title company, or an attorney at law.

**27. Closing Documents.** Borrower and Lender acknowledge that Borrower received copies of all documents which Borrower signed at closing.

**28. Home Equity Indebtedness.** BORROWER AND LENDER ACKNOWLEDGE THAT THE INDEBTEDNESS REPRESENTED BY THE CREDIT AGREEMENT AND SECURITY DOCUMENT IS AN EQUITY LOAN SUBJECT TO SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION.

**29. Right of Rescission.** Borrower and Lender acknowledge that Borrower may, within 3 days after closing, rescind the transaction represented by the Credit Agreement and this Security Document without penalty or charge.

**30. Acknowledgment of Fair Market Value.** Borrower and Lender have acknowledged the fair market value of the Property on the date the transaction evidenced by the Credit Agreement and the Security Document closed.

**31. No Personal Liability.** Notwithstanding anything herein to the contrary, the Indebtedness represented by the Credit Agreement and Security Document is without recourse for personal liability against Borrower unless Borrower obtained the Indebtedness represented by the Credit Agreement and Security Document by actual fraud. The provisions of this Section shall control over any conflicting provisions in the Credit Agreement and Security Document.

**32. Lender's Right to Comply.** It is Lender's and Borrower's intention to conform to provisions of the Texas Constitution applicable to Extensions of Credit as defined by Section 50(a)(6) and Section 50(t), Article XVI of the Texas Constitution.

In the event that Lender should fail to comply with any of Lender's obligations under the Credit Agreement or this Security Document, or in the event that Lender, or any provision in the Credit Agreement or this Security Document fails to comply with pertinent provisions of the Texas Constitution, Borrower agrees to notify Lender of any such failure in writing in the manner set forth in Section 15, specifying how Lender has failed to comply. Lender will have an opportunity to correct the failure to comply, if any, in the manner and within the time period specified by Applicable Law and by the Texas Constitution in particular. Borrower agrees to cooperate in reasonable efforts to effectuate any such compliance, subject to Applicable Law.

To the extent allowable by Applicable Law, in the event that, for any reason whatsoever, any obligation of Borrower or of Lender pursuant to the terms or requirements hereof or of any other loan document shall be construed to violate any of the provisions of the Texas Constitution applicable to Extensions of Credit as defined by Section 50(a)(6) and Section 50(t), Article XVI of the Texas Constitution, then any such obligation shall be subject to the provisions of this Section 32, and subject to Applicable Law, such document shall be automatically reformed, without the necessity of the execution of any amendment or new document, so that Borrower's or Lender's obligation shall be modified to conform to the Texas Constitution, and in no event shall Borrower or Lender be obligated to perform any act, or be bound by any requirement which would conflict therewith.

All agreements between Lender and Borrower are expressly limited so that any interest, loan charge, or fee collected or to be collected (other than by payment of interest) from Borrower, any owner or the spouse of any owner of the Property in connection with the origination, evaluation, maintenance, recording, insuring or servicing of the Extension of Credit shall not exceed, in the aggregate, the highest amount allowed by Applicable Law.

Nothing in this Security Document shall be construed so as to diminish any right Lender may have to cure any violation of Applicable Law in keeping with the terms of Section 50(a)(6)(Q)(x) of the Texas Constitution.

Lender's right to comply as provided in this Section 32 shall survive the payoff of this Extension of Credit. The provisions of this Section 32 shall supersede any inconsistent provision of the Credit Agreement or this Security Document.

BY SIGNING BELOW, each person signing accepts and agrees to the terms and covenants contained in this Security Document and in any Rider(s) executed and recorded with it. Each person signing below acknowledges that the lien created by this Security Document and Deed of Trust is a voluntary lien, and each represents that the signatures below constitute the signatures of

each owner of the Property and each owner's spouse.

CBB 6/24/2020
CHARLIE BROOKS/Date

KBrooks 6/24/2020
KATHRYN BROOKS/Date

/Date

/Date

/Date

/Date

**Acknowledgment of Borrower**

**State of Texas** §
§
**County of** Dallas §

This instrument was acknowledged before me on the 24 day of June 2020 by **CHARLIE BROOKS**.

STONEY WRIGHT
Notary ID #10117866
My Commission Expires
March 18, 2023

Stoney Wright
Notary Signature

**Acknowledgment of Borrower**

**State of Texas** §
§
**County of** Dallas §

This instrument was acknowledged before me on the 24 day of June 2020 by **KATHRYN BROOKS**.

STONEY WRIGHT
Notary ID #10117866
My Commission Expires
March 18, 2023

Stoney Wright
Notary Signature

**Acknowledgment of Spouse of Borrower or Owner (if not a Borrower)**

**State of Texas** §
§
**County of** ____________ §

This instrument was acknowledged before me on the _________ day of ______________________, by .

______________________________
Notary Signature

**Acknowledgment of Spouse of Borrower or Owner (if not a Borrower)**

**State of Texas** §
§
**County of** ____________ §

This instrument was acknowledged before me on the _________ day of ______________________, by

______________________________
Notary Signature

**Acknowledgment of Spouse of Borrower or Owner (if not a Borrower)**

**State of Texas** §
§
**County of** ____________ §

This instrument was acknowledged before me on the _________ day of ______________________, by .

______________________________
Notary Signature

**Acknowledgment of Spouse of Borrower or Owner (if not a Borrower)**

**State of Texas** §
§
**County of** ____________ §

This instrument was acknowledged before me on the _________ day of ______________________, by .

______________________________
Notary Signature

# Exhibit A
## Legal Description:

Being 1.238 acres of land out of the W. D. Stephens Survey, Abstract No. 1495, Tarrant County, Texas, and being the same tract of land conveyed to James E. and Ann E. Hanhart by deed recorded in Volume 12833, Page 105, Deed Records, Tarrant County, Texas, and being more particularly described by metes and bounds as follows:

Beginning at a ½ inch iron rod found in the South right-of-way line of Willow Creek circle at the Northeast corner of said Hanhart tract and the Northwest corner of a called 0.836 acre tract recorded in Volume 15395, Page 67, DRTCT, from which a 5/8 inch iron rod found bears North 62 degrees 56 minutes 00 seconds East, 848.03 feet;

Thence South 27 degrees 04 minutes 00 seconds East with the common East line of said Hanhart tract and West line of said 0.836 acre tract, 249.46 feet (called 249.21 feet) to a 1/2 inch iron rod set for the Southeast corner of said Hanhart tract and the Southwest corner of said 0.836 acre tract in the North line of a called 7.14 acre tract recorded in Volume 14571, Page 416, DRTCT;

Thence South 62 degrees 56 minutes 00 seconds West, with the common South line of said Hanhart tract and the North line of said 7.14 acre tract, 137.20 feet to a ½ inch iron rod found for a corner in the South line of said corner of said Hanhart tract at the Northwest corner of said 7.14 acre tract and Northeast corner of a called 0.77 acre tract recorded in Volume 7822, Page 635 DRTCT;

Thence North 87 degrees 29 minutes 58 seconds West(called North 87 degrees 34 minutes 00 seconds West)with the common South line of said Hanhart tract and North line of said 0.77 acre tract, 130.71 feet to a ½ inch iron rod found for the Southwest corner of said Hanhart tract and the Northwest corner of said 0.77 acre tract in the East line of a called 0.75 acre tract recorded in Volume 11779, Page 381 DRTCT;

Thence North 08 degrees 34 minutes 37 minutes 37 seconds West (called North 08 degrees 27 minutes 00 seconds West) with the common West line of said Hanhart tract and East line of said 0.75 acre tract, 214.80 feet to a ½ inch iron rod set in the South right-of-way line of said Willow Creek circle at the Northwest corner of said Hanhart tract;

Thence with the South right-of-way line of said Willow Creek circle and the North line of said Hanhart tract and with a curve to the left having of a radius 360.00 feet and a central angle of 18 degrees 35 minutes 29 seconds, a distance of 116.81 feet (called 116.60 feet) to a ½ inch iron rod found;

Thence North 62 degrees 55 minutes 39 seconds East, containing with the South right-of-way line of said Wiillow Creek circle and the North line of said Hanhart tract, 67.83 feet to the point of beginning and containing 1.238 acres of land, more or less.

[redacted] PM PG 4 Fee: $31.00 Submitter: SIMPLIFILE
Electronically Recorded by Tarrant County Clerk in Official Public Records
Mary Louise Nicholson

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

# General Warranty Deed

STATE OF TEXAS §
KNOW ALL MEN BY THESE PRESENTS
COUNTY OF TARRANT §

GF No. [redacted]

FOR THE CONSIDERATION OF **TEN DOLLARS ($10.00) CASH** AND OTHER VALUABLE CONSIDERATION, the receipt and sufficiency of which is expressly acknowledged, **Charlie Brooks, a married man** (hereinafter referred to as "Grantor"), has GRANTED, SOLD AND CONVEYED and by these presents does GRANT, SELL and CONVEY unto **Charlie Brooks and wife, Kathryn Brooks,** whose address is 109 Willow Creek Cir, Mansfield, TX 76063, (hereinafter referred to as "Grantee"), the following described property, including all improvements thereon, located in **Tarrant** County, Texas (said premises hereinafter referred to as the "Property"), to wit:

**See Exhibit "A" attached hereto and made a part hereof for all purposes.**

Reservations from Conveyance:

None.

Exceptions to Conveyance and Warranty:

Validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing restrictions, reservations, covenants, conditions, oil and gas leases, mineral interests, and water interests outstanding in persons other than Grantor, and other instruments, other than conveyances of the surface fee estate, that affect the Property; validly existing rights of adjoining owners in any walls and fences situated on a common boundary; any discrepancies, conflicts, or shortages in area or boundary lines; any encroachments or overlapping of improvements; and taxes for the current year, which Grantee assumes and agrees to pay, and subsequent assessments for that and prior years due to change in land usage, ownership, or both, the payment of which Grantee assumes.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anyway belonging, unto Grantee and Grantee's heirs, successors and assigns forever; and Grantor does hereby bind Grantor and Grantor's heirs and successors to WARRANT AND FOREVER DEFEND all and singular the Property, unto the Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

When the context requires, singular nouns and pronouns include the plural.

WITNESS THE EXECUTION HEREOF AS OF June 24, 2020.

Charlie Brooks

ACKNOWLEDGEMENT

STATE OF TEXAS §

COUNTY OF Dallas §

Acknowledged before me on the 24 day of June, 2020, by Charlie Brooks.

STONEY WRIGHT
Notary ID #10117866
My Commission Expires
March 18, 2023
NOTARY PUBLIC STATE OF TEXAS

Notary Public
My commission expires: 3/18/2023
Stoney Wright

**PREPARED BY:**
Robertson Anschutz Vetters, LLC
7145 N. George Bush Highway
Garland, TX 75044

**AFTER RECORDING RETURN TO:**
Priority Settlement Group of Texas, LLC
7600 Burnet Road, Suite 160
Austin, TX 78757

Exhibit "A"

Being 1.238 acres of land out of the W. D. Stephens Survey, Abstract No. 1495, Tarrant County, Texas, and being the same tract of land conveyed to James E. and Ann E. Hanhart by deed recorded in Volume 12833, Page 105, Deed Records, Tarrant County, Texas, and being more particularly described by metes and bounds as follows:

Beginning at a ½ inch iron rod found in the South right-of-way line of Willow Creek circle at the Northeast corner of said Hanhart tract and the Northwest corner of a called 0.836 acre tract recorded in Volume 15395, Page 67, DRTCT, from which a 5/8 inch iron rod found bears North 62 degrees 56 minutes 00 seconds East, 848.03 feet;

Thence South 27 degrees 04 minutes 00 seconds East with the common East line of said Hanhart tract and West line of said 0.836 acre tract, 249.46 feet (called 249.21 feet) to a 1/2 inch iron rod set for the Southeast corner of said Hanhart tract and the Southwest corner of said 0.836 acre tract in the North line of a called 7.14 acre tract recorded in Volume 14571, Page 416, DRTCT;

Thence South 62 degrees 56 minutes 00 seconds West, with the common South line of said Hanhart tract and the North line of said 7.14 acre tract, 137.20 feet to a ½ inch iron rod found for a corner in the South line of said corner of said Hanhart tract at the Northwest corner of said 7.14 acre tract and Northeast corner of a called 0.77 acre tract recorded in Volume 7822, Page 635 DRTCT;

Thence North 87 degrees 29 minutes 58 seconds West(called North 87 degrees 34 minutes 00 seconds West)with the common South line of said Hanhart tract and North line of said 0.77 acre tract, 130.71 feet to a ½ inch iron rod found for the Southwest corner of said Hanhart tract and the Northwest corner of said 0.77 acre tract in the East line of a called 0.75 acre tract recorded in Volume 11779, Page 381 DRTCT;

Thence North 08 degrees 34 minutes 37 minutes 37 seconds West (called North 08 degrees 27 minutes 00 seconds West) with the common West line of said Hanhart tract and East line of said 0.75 acre tract, 214.80 feet to a ½ inch iron rod set in the South right-of-way line of said Willow Creek circle at the Northwest corner of said Hanhart tract;

Thence with the South right-of-way line of said Willow Creek circle and the North line of said Hanhart tract and with a curve to the left having of a radius 360.00 feet and a central angle of 18 degrees 35 minutes 29 seconds, a distance of 116.81 feet (called 116.60 feet) to a ½ inch iron rod found;

Thence North 62 degrees 55 minutes 39 seconds East, containing with the South right-of-way line of said Wiillow Creek circle and the North line of said Hanhart tract, 67.83 feet to the point of beginning and containing 1.238 acres of land, more or less.

# LEGAL REPRESENTATION DISCLOSURE AGREEMENT

Property: [redacted] Mansfield, TX 76063

Legal instruments and other loan documents, if any, in connection with this loan and real property transaction (the "Transaction") have been prepared at the request of the title company by the law firm of Robertson, Anschutz, Vetters As a part of the contractual obligation to pay the reasonable expenses in connection with the consummation of the sale and conveyance of the real property (the "Property"), the Buyer/Borrower agrees to pay the legal fees charged for the preparation of legal instruments and loan documents at closing. The Borrower acknowledges that the fees charged by Robertson, Anschutz, Vetters as set out in the law firm's invoice, are based on the standard fees charged for the preparation of closing documents for similar real estate transactions. The Buyer/Borrower further acknowledges that Robertson, Anschutz, Vetters has not, in any manner, undertaken to assist or render legal advice with respect to the Loan and/or the purchase of the Property, or with respect to any of the documents or instruments being executed in connection with those transactions. By signing below, the Buyer/Borrower acknowledges that they are aware that they may consult independent counsel or hire an attorney to represent then and advise them regarding this transaction and is consequences to them. The Buyer/Borrower has not been charged any fee for preparation of any federal disclosures such as the Truth in Lending Statement.

If Robertson, Anschutz, Vetters has prepared a warranty deed with respect to the Property, at the expense of the Seller, it is for the purpose of assuring the Lender that a proper vendor's lien has been retained and transferred therein to the Lender; and/or if Robertson, Anschutz, Vetters has prepared other instruments at the expense of the Seller in connection with this transaction, the Seller acknowledges that all instruments have been prepared by Robertson, Anschutz, Vetters based on information provided to Robertson, Anschutz, Vetters by the closing agent either directly or through the Lender, that Robertson, Anschutz, Vetters has not undertaken, an any manner, to assist or render legal advice to the Seller with respect to this transaction, and that Robertson, Anschutz, Vetters makes no representations to the Seller that it has undertaken any independent effort to verify the information provided to Robertson, Anschutz, Vetters and utilized for the preparation of the warranty deed or other instruments. Seller is further advised to consult its own legal counsel before signing the warranty deed. Additionally, by signing below you acknowledge you are aware that you are free to hire a lawyer or attorney to represent you and advise you regarding this transaction, to review all of the writings pertaining to this transaction and their consequences for you.

Robertson, Anschutz, Vetters prepared the various legal instruments and loan documents, if any, in connection with this transaction by signing below you are acknowledging that Robertson, Anschutz, Vetters has not represented you or given you any legal advice concerning the acquisition or sale of the Property, the legal instruments, or loan documents executed in connection with the transaction, or the closing of the transaction itself.

By signing below you acknowledge you are aware you must pay at the time of closing or on demand the legal fees of Robertson, Anschutz, Vetters as you may have agreed to pay in the earnest money contract or any other documents you may have signed. The charges for the services of Robertson, Anschutz, Vetters are set forth on the closing statement or settlement furnished by the title company. Furthermore, you acknowledge to Robertson, Anschutz, Vetters that you have received a copy of this disclosure, you have read all of the above statements, you understand them, and you acknowledge that what has been stated in this disclosure is accurate and truthful. Both parties to this transaction acknowledge that Robertson, Anschutz, Vetters does not represent either party in this transaction, whether or not Robertson, Anschutz, Vetters has represented or may be representing any of the undersigned in any other transaction.

SIGNED THIS 24th DAY OF June, 2020.

Buyer/Borrower(s)

| | |
|---|---|
| *[signature]* | KBrooks |
| Charlie Brooks | Kathryn Brooks |

Nov 3rd TAD Board Election Info - Click Here

# Account [redacted]

## Address: [redacted] CREEK CIR

Export Property Page

## Location




This map, content, and location of property is provided by Google Services.

**Address:** [redacted]
**City:** TARRANT COUNTY
**Georeference:** A1495-1C02
**Subdivision:** I and G N RR CO SURVEY
**Neighborhood Code:** 1A010A

**Latitude:** 32.5773181377
**Longitude:** -97.2035692565
**TAD Map:** 2090-328
**MAPSCO:** TAR-122L

## Property Data

**Legal Description:** STEPHENS, W D SURVEY [redacted]
**Jurisdictions:**
TARRANT COUNTY (220)
TARRANT COUNTY HOSPITAL (224)
TARRANT COUNTY COLLEGE (225)
MANSFIELD ISD (908)
**State Code:** A
**Year Built:** 1979
**Agent:** CHANDLER CROUCH (3662597 - 11730)
**Approximate Size+++:** 2,491
**Percent Complete:** 100%
**Land Sqft*:** 54,014
**Land Acres*:** 1.2400
**Pool:** Y

**Notice Sent Date:** 4/15/2026
**Notice Value:** $537,099
**Protest Deadline Date:** 5/15/2026

+++ Rounded.
* This represents one of a hierarchy of possible values ranked in the following order: Recorded, Computed, System, Calculated.

## Property Documents

**Documents**

**2026 Documents**
Value Notice 2026-04-17
Hearing Notice 2026-05-19

Hearing Notice 2026-05-19

**2025 Documents**

Show Documents

# Owner Information

**Current Owner:**
CHARLIE & KATHRYN BROOKS

**Attention Line:** None
**Primary Owner Address:**
[redacted]
MANSFIELD, TX 76063

**Deed Date:** 6/24/2020
**Deed Volume:**
**Deed Page:**
**Instrument:** D220151321

**Previous Owners:**

**Name**
BROOKS CHARLIE
**Date**
8/4/2016
**Instrument**
D216189580
**Deed Volumne**
**Deed Page**

**Name**
FEDERAL NATL MTG ASSN
**Date**
4/14/2016
**Instrument**

D216077593

**Deed Volumne**

**Deed Page**

---

**Name**

NATIONSTAR MTG LLC

**Date**

4/5/2016

**Instrument**

D216073564

**Deed Volumne**

**Deed Page**

---

**Name**

SLOAN LESLEY A EST

**Date**

11/13/2006

**Instrument**

D206382395

**Deed Volumne**

0000000

**Deed Page**

0000000

---

**Name**

SLOAN LESLEY A; SLOAN MARY

**Date**

4/14/2004

**Instrument**

D204122714

**Deed Volumne**

0000000

**Deed Page**

0000000

---

**Name**

HANHART ANN E; HANHART JAMES E

**Date**

7/3/1997

**Instrument**

00128330000105

**Deed Volumne**

0012833

**Deed Page**

0000105

---

**Name**

COOK DONALD FRANKLYN

**Date**

5/3/1995

**Instrument**

00119600000635

**Deed Volumne**

0011960

**Deed Page**

0000635

---

**Name**

MASSEY DAN J

**Date**

12/21/1994

**Instrument**

00118360001539

**Deed Volumne**

0011836

**Deed Page**

0001539

---

**Name**

JACOBS PATRICIA ANN

**Date**

9/6/1990

**Instrument**

00100390001632

**Deed Volumne**

0010039

**Deed Page**

0001632

---

**Name**

HUDGENS CAROLYN; HUDGENS RALPH

**Date**

5/29/1985

**Instrument**

00081950001159

**Deed Volumne**

0008195

**Deed Page**

0001159

---

**Name**

BEARD JNO C

**Date**

12/31/1900

**Instrument**

00000000000000

**Deed Volumne**

0000000

**Deed Page**

0000000

---

# $ Values

This information is intended for reference only and is subject to change. It may not accurately reflect the complete status of the account as actually carried in TAD's database. Tarrant County Tax Office Account Information.

---

**Year**
2026

**Improvement Market**
$66,680

**Land Market**
$189,400

**Total Market**
$256,080

**Total Appraised+**
$256,080

**Net Appraised**
$256,080

---

**Year**
2025

**Improvement Market**
$184,000

**Land Market**
$107,000

**Total Market**
$291,000

**Total Appraised+**
$291,000

**Net Appraised**
$291,000

---

**Year**
2024

**Improvement Market**
$223,737

**Land Market**
$107,000
**Total Market**
$330,737
**Total Appraised+**
$330,737
**Net Appraised**
$330,737

**Year**
2023
**Improvement Market**
$304,969
**Land Market**
$104,600
**Total Market**
$409,569
**Total Appraised+**
$300,744
**Net Appraised**
$409,569

**Year**
2022
**Improvement Market**
$255,853
**Land Market**
$64,800
**Total Market**
$320,653
**Total Appraised+**
$273,404
**Net Appraised**
$320,653

**Year**
2021

**Improvement Market**
$183,749

**Land Market**
$64,800

**Total Market**
$248,549

**Total Appraised+**
$248,549

**Net Appraised**
$248,549

Pending indicates that the property record has not yet been completed for the indicated tax year.
+ Appraised value may be less than market value due to state-mandated limitations of value increases.

## Exemptions / Special Appraisal

HOMESTEAD GENERAL 11.13(b)

Per Texas Property Tax Code Section 25.027, this website does not include exemption information indicating that a property owner is 65 years of age or older for unauthorized individuals.

Property Tax Assistance
News
Data Downloads
Rates
Reports
Public Information Act Request
Property Tax Transparency in Texas

Quick Links
Take A Survey
Contact Us

## Contact

Tarrant Appraisal District
2500 Handley-Ederville Road
Fort Worth, Texas 76118-6909

(817) 284-0024

## Business Hours

Monday - Friday
8:00am - 5:00pm

© 2026 Tarrant Appraisal District